OPINION OF THE COURT
Bertram R. Gelfand, S.
This is a proceeding to judicially settle the account of a testamentary trustee. Objections have been filed by the New York State Department of Mental Hygiene to the disallowance of its claim for reimbursement for the cost of the care of the life beneficiary of the trust who is a daughter of the testator.
The life beneficiary is a patient at the Rockland Psychiatric Center (formerly Rockland State Hospital). She has been at said institution since January 20, 1947. The trust income which has been applied to the cost of her care has been insufficient to meet such cost. On total charges of $102,670.10, there exists an unpaid deficit of $82,910.36 for the period ending June 1, 1975. In addition to the claim set forth in the objections, the agreed statement of facts upon which the matter is submitted, indicates that the claim will be amended to reflect further charges of $42,497.70 for the period from June 2, 1975 through December 31, 1977. After the submission of this amendment and the deduction of all credits, the amended net claim will total $119,127.43. The correctness of this figure is disputed by petitioner. The present corpus of the trust is approximately $62,000.
The life beneficiary is 77 years of age. She is confined to a wheelchair, incontinent and in need of total care. Although diagnosed as harboring paranoid delusions, she is described as being in contact and well oriented. Her present institutionalization is on a voluntary basis, although a recent prognosis *955 indicates she does not meet the criteria for a skilled nursing home, a health related facility, or an adult residence. It is accordingly predicted that she will remain at the institution where she presently resides for the rest of her life.
On July 24, 1956 the life beneficiary was adjudicated an incompetent by an order of the Supreme Court, Bronx County. Her brother was appointed her committee by a commission issued August 7, 1956. He was discharged as committee and his account settled by an order of the Supreme Court, Bronx County, entered on May 24, 1972. That order directed the balance of the committee’s assets, the sum of $1,562.48, to be paid to the Department of Mental Hygiene as a luxury and burial fund. It further directed that in lieu of appointing a new committee, the director of Rockland Psychiatric Center was authorized to become the direct payee of the income received from the trust. Since that time the director has been receiving such trust income.
Decedent, whose testamentary instrument established the trust, died February 26, 1937. His last will and testament executed on December 8, 1924, until modified by a codicil, left his residuary estate in equal shares to his five children, including the life beneficiary. Under the terms of the will, the share of the present life beneficiary was placed in trust until she attained the age of 30 years. At that time she was to receive the corpus. During the trust she was to receive income in quarter annual installments. A codicil dated February 12, 1932 modified the provisions of the will with reference to the life income beneficiary to the extent of providing that her share of the estate was to be held in trust for her natural life with income payable to her in quarter annual, or more convenient installments. Upon her death the corpus was to pass to her distributees. At this time these distributees are her sister, who is the trustee, and a nephew and niece.
Paragraph 3d of the codicil further provides as follows: "In addition my said executors and trustees are authorized in the exercise of their discretion to pay out of the principal of said fund such sum or sums as may be necessary to provide for the payment of any and all expenses necessary for the maintenance and support of my said daughter Marie Escher by reason of any illness, accident, or other emergency, and such withdrawal shall be entirely within the discretion of my said trustees and the survivor and successor trustees, and said withdrawals and disbursements made for the benefit of my *956 said daughter Marie Escher shall not be subject to objection in any proceeding by or on her behalf.”
It is the contention of the Department of Mental Hygiene that under the aforesaid quoted provision the trustee should be directed to exercise her discretion and deliver the entire remaining corpus to the objectant in satisfaction of its unpaid bill. This represents a clear change in position from the obvious course that the department has followed for approximately three decades in which it has accepted the income of the trust without any demand for current payment of the deficit created by the insufficiency of income to equal cost.
Both petitioner and guardian ad litem contend that a substantial portion of objectant’s claim is time-barred. This contention is without merit. Time limitations during which a claim may be asserted exist only to the extent that they are created by statute. (CPLR 201; People ex rel. Schick v Marvin, 249 App Div 293, 297; Labor Relations Bd. v Wyckoff Hgts. Hosp., 59 Misc 2d 284, 289).
Subdivision (c) of section 43.07 of the Mental Hygiene Law cited in opposition to the objection does provide as follows: "An action to collect fees due pursuant to this chapter shall commence within six years from the accrual of the cause of action. The cause of action accrues when the fees become due.” Although the language of this section would appear to bar substantial portions of the claim, the statute was not enacted until 1972, and did not take effect until January 1, 1973 (L 1972, ch 251). Prior to January 1, 1973, the controlling statute was the former subdivision 6 of section 24 of the Mental Hygiene Law (subd 8 subsequent to 1966) which expressly provided that the six-year period of limitation for the collection of charges for the care of a patient did not commence to run until the date of death or discharge of the patient, whichever occurred first. (See, also, Matter of Leahy, 56 NYS2d 555.)
 Statutes of Limitations when enacted are to be given only prospective application unless a legislative intent to the contrary is clearly established (McKinney’s Cons Laws of NY, Book 1, Statutes, § 59; CPLR 218, subd [b]; Beresovski v Warszawski, 28 NY2d 419; Tamburello v Mooney, 51 Misc 2d 1093). No intent is discernible on the part of the Legislature to the effect that subdivision (c)-of section 43.07 of the Mental Hygiene Law be retroactive. In fact section 91.03 of the Mental Hygiene Law specifically provides to the contrary. *957 Accordingly, with reference to those charges which accrued prior to January 1, 1973, no Statute of Limitations has yet commenced to run since the patient is neither dead nor discharged. With reference to the post-January 1, 1973 charges, the six-year statute has not expired as to any portion of those charges. It is therefore determined that no portion of the objection is time-barred. It having been concluded that the Statute of Limitations is not dispositive of the objection they must be determined upon their merits.
The provisions of EPTL 7-1.6 are of no avail to the objectant. By its express terms EPTL 7-1.6 (subd [a]) may be applied retroactively but an invasion of principal is only authorized upon the written consent of all persons beneficially interested in the trust. No such consents are forthcoming from the remaindermen, all of whom fall into the category of parties beneficially interested in the trust. Pursuant to EPTL 7-1.6 (subd [b]) invasion of principal is permissible without the consent of all interested parties but, by its express terms, may not be applied to trusts created prior to its effective date. The effective date of EPTL 7-1.6 is September 1, 1967 (L 1966, ch 952) and the effective date of the predecessor statutes was June 1, 1966 (L 1938, ch 377, as amd by L 1965, ch 699; Real Property Law, § 103-a; Personal Property Law, § 15-a; Matter of Harold, 87 Misc 2d 1001). The right of the objectant to relief, if any, must accordingly be found within the terms of the instrument itself.
The terms of the instrument must be reviewed in the light of the obvious knowledge, at the time of execution, which the testator had with reference to the disabilities of the life income beneficiary. The provisions made for the life beneficiary indicate a conclusion that she would never be self-supporting or fully capable of handling her own affairs. This conclusion leads to an apparent primary purpose on the part of the testator to provide for her basic needs on an ongoing basis. The codicil also reflects a recognition by the testator that this purpose could best be accomplished within the framework of a trust that would continue so long as the life beneficiary lived. It is noted that an interest in the estate equal to that of the life beneficiary is given to each of the testator’s other issue, but their shares were bequeathed outright to them upon attaining age 21. This sustains the conclusion that the trust provision for the life beneficiary flowed from her being under an apparent disability.
*958 With absolute specificity, the instrument reflects that it was the desire of the testator that to the extent the corpus was not required to provide the life beneficiary with that which she would not otherwise receive, he wished the corpus to pass to her distributees, who would likely be his other issue, or, if they were deceased, to their descendents surviving at the time of the termination of the trust.
The portion of paragraph 3rd of the codicil which creates an authorization to invade corpus indicates that this authority is limited to invasions to meet an "emergency” circumstance. It does not suggest that the testator, when executing the codicil in the context of the depression economy of 1932, could possibly have envisioned the trust income ever being insufficient to meet the "usual” needs of the life beneficiary.
It is also obvious that the application of the total corpus to pay for the care which the life beneficiary has already received over the last 31 years, will not provide the life beneficiary with any care or other benefit which she would not otherwise enjoy if the corpus were not applied to the payment of these past accrued charges. The success of the objections are thus essentially dependent upon a series of cases from courts of original jurisdiction which on the facts in those cases, direct an invasion of trust corpus in order to prevent the needs of the life beneficiary from being met by publicly funded programs. (Matter of Harold, 87 Misc 2d 1001, supra, Matter of Marafioti, 80 Misc 2d 206; Matter of Browning, 76 Misc 2d 1041; Matter of Cooper, 76 Misc 2d 166; Matter of Crow, 56 Misc 2d 398; Matter of Schram, 49 Misc 2d 1025; Matter of Bins, 48 Misc 2d 921; Matter of Van Gaalen, 38 Misc 2d 853; Matter of Gruber, 122 NYS2d 654; Matter of Damon, NYLJ, March 14, 1978, p 12, col 3.) Generally, the results in these cases appear to rest on the suggestion of the existence of an overriding public policy that trusts not be left intact where their corpus can prevent a life beneficiary’s needs from being discharged by public funds, combined with a presumption that when a testator confers a life interest upon a testamentary beneficiary, there is always an intent that under no circumstances are any of the needs of this life beneficiary to become a burden on any publicly funded program. The philosophy which permeates the cases expressing this public policy and implied intent that the trustee invade corpus is aptly expressed in the following language of Matter of Van Gaalen (38 Misc 2d 853, 855, supra) construing in *959 general terms the nature of all programs paid for by the government for the welfare of its citizens: "Charity bestowed by the State or any local political subdivision thereof to alleviate the suffering of the destitute is a grant or gift by an enlightened government that seeks to keep its less fortunate citizens from deprivation and want. It is in fact a gift by all the other citizens of the State and community who work, earn and pay taxes to the less fortunate who are unable to work and support themselves.”
The cases presume that a person would prefer paying for the needs of those dear to him in lieu of welfare contributing thereto. Since the expression of this philosophy, public assistance has evolved from being a "gift” into a "right” which must be provided by State and local governments to all who show need, without even regard to the capacity of their respective taxpayers to generate the required revenue to pay the mounting cost of this right. The emergence of this right is evidenced by the fact that a recipient’s benefits may no longer be terminated without all the safeguards of constitutional due process (Goldberg v Kelly, 397 US 254; NY Const, art XVII, § 1; Tucker v Toia, 43 NY2d 1; Matter of Jones v Berman, 37 NY2d 42). Public assistance programs have expanded from classic "welfare” to prevent a party from becoming destitute into a multitude of social insurance programs designed to meet the peculiar needs of the ill, the aged, the disabled, and the handicapped. In the context of modern society, the stigma attached to receiving the benefits of these programs has largely disappeared, particularly with reference to those programs designed to meet the astronomical cost of illness or institutional care of any sort.
Today, programs to pay medical and institutional care are viewed more as an insurance benefit than charity. In view of the vast costs involved, it is a benefit which logic suggests that most citizens would seek for their loved ones, should they require institutional care, in preference to rapidly expending their total assets before seeking the benefits of such programs. It is divorced from the realities of life to presume that if testator were aware of the facts as they now exist, he would desire to pay the immense cost for his daughter’s care in preference to having society share this burden. To apply to these facts a conclusion that the testator would find accepting benefits to be a repugnant humiliation at becoming the object of charity is an anachronism.
*960 The language of paragraph 3d of the codicil indicates an intent to limit the trustee’s discretion to invade corpus to the existence of an "emergency”. No emergency exists with reference to bills which the objectant has allowed to accrue for approximately 31 years, throughout which period, the trust has always been in existence. Under these circumstances, to rely on public policy or presumed intent not evidenced from the terms of the trust as a basis to totally liquidate the corpus to pay these bills, where payment will have no impact on the present or future needs of the life beneficiary, would be unfairly prejudicial to the life income beneficiary and an arrogant disregard of the testator’s intent. The prejudice to the life beneficiary flows from eliminating the trust as a source of income for her needs should the prognosis as to continued institutionalization be incorrect, or if current programs from which her needs above income are met be modified adversely to her in the future. It is noted that the life beneficiary, according to the vital statistics of the United States, 1973, issued by the Department of Health, Education and Welfare, has a present life expectancy of 9.3 years.
In examining the relevance of any controlling public policy, significance must be attached to the statutory obligations which the testator would have for the life beneficiary if he were alive. The testator, if alive, would have no obligation to provide for the cost of his daughter’s maintenance. This duty would have ceased when she reached age 21 (Domestic Relations Law, § 32, subd 2; Social Services Law, § 101, subd 1; Family Ct Act, § 413). Thus, if the testator were still alive, regardless of the scope of his assets, his daughter would be entitled to have the cost of her care at Rockland Psychiatric Center met from public funds in the absence of the daughter having assets of her own. Even if the daughter were a person whom the testator was still obligated to support, if able, this is an obligation which would cease upon his death and would not be an obligation which upon his demise became an estate obligation (see Domestic Relations Law, § 32, subd 3; Family Ct Act, § 414). Nor does any statute exist which would require him to make his daughter a beneficiary of his estate. Objectant presents neither statutory nor common-law authority which would justify impressing on a testamentary trust a greater obligation than testator would have if alive.
It is the conclusion of this court that the rigidity of any possible public policy requiring an invasion of trust corpus to *961 relieve the burdens of a publicly funded program is subject to dilution, if it extends at all, in situations where the expenditure involved is the current astronomical cost of institutional care where the application of the total corpus to these charges would summarily render meaningless, a testamentary scheme, carefully designed to carry out an intent to retain some portion of a trust corpus for the ongoing needs of the life beneficiary, with a remainder for the benefit of other surviving issue. A contrary conclusion would, for almost all testators, except the most affluent, totally vitiate the viability of testamentary trusts as a device for bequeathing a remainder should the vicissitudes of life lead to an aged life beneficiary requiring extended institutional care. In the absence of a specific statutory mandate from the Legislature to this effect, it cannot be concluded that the present posture of the law requires so fatal a blow to the sanctity of testamentary intent with reference to the corpus of trusts in a situation where the invasion of corpus will not pragmatically, in any way, confer a tangible benefit upon the life beneficiary who has only an interest that is clearly circumscribed by the terms of the trust.
The objection interposed herein cannot be sustained except by disregarding all consideration of testamentary intent and possible future needs of the life beneficiary in favor of a rigid public policy for which no support can be found in statutes, the common law, or any appellate authority. Accordingly, it is concluded that under the terms of the trust at issue, it is not an abuse of discretion for the trustee to decline to invade corpus for the purpose advocated by objectant. The objections are dismissed.
This matter is factually distinguishable from Matter of Steinberg (NYLJ, May 12, 1978, p 12, col 5). The facts in that case presented an apparent intent of the testator for the trustee to invade for the primary beneficiary that is not evidenced in this matter. In the absence of a governing statutory mandate, questions relative to invasion of the corpus of a trust must be controlled by a determination of the intent of the creator of the trust. The individual intent of testators must be determined based on the language of the instrument, the nature of the remaindermen and the relationships of the testator to the life beneficiary and the remaindermen, as well as any other pertinent facts indicative of intent.